**People of the State of Illinois, Plaintiff-Appellee, v. George Percy Styles, Defendant-Appellant.**

**Gen. No. 50,383.**

First District, First Division.

October 3, 1966.

Marshall A. Patner and Steven L. Larson, of Chicago, for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James B. Zagel, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

After a bench trial, defendant, George Percy Styles, was found guilty of the offenses of murder and of theft. He was sentenced to the penitentiary for 30 to 60 years on the murder conviction and for 5 to 10 years on the theft, the sentences to run consecutively.

On appeal the determinative contentions are (1) that statements given by the defendant to the police and to a polygraph operator were obtained in violation of his constitutional rights and were consequently inadmissible; and (2) that the State failed to show that defendant was guilty of theft of goods valued at over $150, the offense charged and the offense for which the defendant was sentenced.

On February 15, 1964, between 5:00 and 5:30 p. m., Leonid Neumann was found dead in his third-floor apartment. The door was ajar; the apartment was dark; the room was in disorder; the windows were open; and the body of the decedent, covered with a blanket, was lying on a cot at the far end of the room. It was a large "L"-shaped apartment with a divider, a bathroom and a small kitchen. Police officers arrived shortly after 6:00 p. m., and they found the body lying nude on a cot, covered with a sheet and an electric blanket. The electric blanket was plugged in and set at a temperature of 100 degrees. The police found a wound in the neck and a bruise on the head. Partly congealed blood was still oozing from the nose and throat. The police found fragments of a ceramic lamp lying about the head of the deceased, and in the kitchen they found a blood-stained knife.

On the morning of February 16, 1964, after 9:00 a. m., Dr. James Henry of the Cook County Coroner's office performed an autopsy on the body. The internal examination showed that four stab wounds had penetrated the right side of the heart, and it was Dr. Henry's opinion that the stab wounds were the immediate cause of death. He found no evidence of "any decomposition of the body," which usually sets in somewhere around eighteen and twenty-four hours in a warm room. He had no opinion "as to how long he had been dead" prior to the autopsy. He further testified that covering a body with an electric blanket at 100 degrees temperature would hasten decomposition.

Two months after the murder, the police learned that defendant had pawned a camera that had belonged to the decedent, and they secured a warrant for defendant's arrest for the theft of the camera. They went to defendant's apartment on April 15, 1964, and he was arrested in the hallway outside of his apartment at about 1:00 a. m. He was taken into the apartment and there questioned by the police about items found in his room. He identified a TV set, a radio, figurines, a suitcase, a letter opener, and a pair of scissors as coming from decedent's apartment, and said that he had been at the decedent's apartment in Evanston on February 14, 1964. Later in the day, April 16, 1964, at about 10:00 a. m., in the Evanston police station in the presence of four persons, and after questioning, defendant said he would take full responsibility for the death of the decedent; that if he were not at decedent's apartment decedent would be alive; and further that he had had sexual relations with the decedent.

In addition to the foregoing summarized evidence, Bert Lindgren, a witness for the State, testified that on February 15, 1964, while on duty as a cabdriver, he picked up a passenger at about 2:00 a. m. at 1310 Chicago Avenue in Evanston; that it was defendant, his hair was

swept back, and he was wearing nice looking women's clothing; that he took the defendant for a female at the time; that defendant asked him to carry a TV set downstairs for him; that they walked to the apartment on the top floor, and defendant opened the door and they walked in; that he went about five or six feet into the apartment, and the lights were off; that he picked up the TV set and carried it downstairs and put it in the cab, and that they drove to the west side of Chicago, where he carried the TV set to a gangway, and defendant paid him, and he left.

John E. Reid, a witness for the State, testified that he was the director of John E. Reid and Associates, a polygraph firm in Chicago; that he had a conversation in his office with the defendant at 5:00 p. m. on April 16, 1964; that no one else was present; that he asked defendant whether he stole a TV set from decedent's apartment, and defendant nodded assent that he did; that he asked defendant whether he killed the decedent, and defendant replied, "Look it, I take all the responsibility for the killing of Neumann. I agree you have made your case. Send me to the electric chair. I don't care. Two years ago the bottom dropped out of my life and I became a male prostitute. No one will care after I go to the electric chair." Later, and before several police officers, Reid asked defendant if he killed Neumann, and defendant replied, "No, I did not but I am telling you again that I take all the responsibility for the killing of Neumann."

On cross-examination, Mr. Reid testified that defendant never said that he killed the decedent, and that defendant was not represented by counsel and was not informed that his answers might be used against him.

Defendant testified at length: He began a relationship with decedent as a female impersonator and saw the decedent twice a month during an 18-month period, usually in decedent's apartment. It was not on a cash-

and-carry basis, and decedent sometimes bought him clothes or gave him money and advanced him money for rent. Decedent gave him the camera and the figurines and loaned him the TV set. He further testified that he had been in decedent's apartment on the evening of February 14, and when he left the apartment between 1:15 and 1:30 in the morning of February 15, decedent was alive; that he had a key to the apartment and had not left the door open when he left; that the windows in the apartment were down because of the cold; and that he did not kill the decedent.

When questioned regarding the statements he made about his responsibility for the murder, defendant testified, "I had been up from approximately one o'clock in the morning until approximately seven o'clock next afternoon being constantly questioned without any sleep and I had only two sandwiches and only two cups of coffee, from 11th and State to Evanston and Evanston back to Chicago for the lie detector test, back to Evanston to be questioned again and I told the police department. These are the exact words. I remember them. I said if someone would take the full responsibility of Mr. Neumann's death so that I can get some rest, I will take it, without saying I had committed the murder. These were the exact words. I would take the full responsibility for his having been killed, and probably would not have been if it had not been for me, that he would be living. I am sure that is what I said. I knew neither did I say I killed anyone."

As to the murder conviction, defendant argues that the evidence on behalf of the State shows nothing more than that the defendant knew the decedent; that defendant was at decedent's apartment until 2:00 a. m. on February 15, 1964; that the decedent's body was found 16 hours later; that the defendant, two months later, had in his possession goods that had once belonged to decedent; and that after 16 hours of questioning, the

485

defendant, while continuing to deny that he had killed the decedent, said he would take the responsibility for the decedent's death.

Defendant further argues that Dr. Henry testified death from the stab wound to the heart was immediate and, therefore, his examination of the body of the decedent must have taken place approximately 32 hours after the alleged murder; that the body showed no evidence of decomposition; that decomposition sets in from 18 to 24 hours after death under normal circumstances; and that a body left under a heating blanket set at 100 degrees would decompose more rapidly. From this defendant asserts that the evidence of the State showed the decedent was probably murdered "at the earliest, sometime after 9:30 a. m. on the morning of February 15, 1964," and at least seven hours after defendant left the apartment.

Defendant contends that the statements made when he was not represented by counsel and had not been advised of his right to remain silent were obtained in violation of his constitutional rights and were consequently inadmissible. (McLeod v. Ohio, 381 US 356 (1965) ; Massiah v. United States, 377 US 201 (1964) ; Escobedo v. Illinois, 378 US 478 (1964).) The State argues that the foregoing authorities are inapplicable, and that the principles announced in People v. Hartgraves, 31 Ill2d 375, 202 NE2d 33 (1964), and People v. Kees, 32 Ill2d 299, 205 NE2d 729 (1965), should be applied here.

■ ■ Considering this record in its entirety, and in view of our conclusions, a discussion of the foregoing authorities is not required. Defendant testified freely as to his association with the decedent and his presence at the apartment about 16 hours before the body was found. His testimony comes within the rule that "when a defendant elects to justify or explain his presence at or near the scene of a crime, while denying participation, he must tell a reasonable story or be judged by its improbabili-

ties." (People v. Lane, 29 Ill2d 326, 331, 194 NE2d 272 (1963).) However, the attendant circumstances under which the alleged admissions of guilt were made raise serious doubts as to whether they were voluntarily made, or whether they were procured by pressure of hope or fear or other undue means used for the purpose of producing such admissions of guilt which are sufficient to convince us that defendant's conviction of murder should be reversed and a new trial ordered. See Watts v. Indiana, 338 US 49 (1949), and Fikes v. Alabama, 352 US 191, 197 (1957).

■ As to the theft conviction, the State concedes in its brief and in oral argument that the theft conviction should be reversed because the State failed to prove the value of the articles alleged to have been stolen by defendant, a material fact necessary to be proved in order to support the theft sentence. We agree. See People v. Fognini, 374 Ill 161, 165, 28 NE2d 95 (1940). However, defendant contends, "There is no evidence in this case, other than that the Defendant allegedly nodded his head when asked by Mr. Reid whether he had stolen the television set, that tends to disprove the Defendant's story that Mr. Neumann gave him the articles he was alleged to have stolen."

■ ■ We do not agree with this contention of defendant, even though we find defendant's alleged admission to Reid of the theft to be inadmissible. It is undisputed that all of the articles in evidence, with the exception of the suitcase and the pawned camera, had belonged to the decedent and were found in defendant's apartment. The circumstances surrounding the taking of the television set were unusual, and defendant's credibility was a question for the trier of the fact. We believe the facts in evidence brought the theft charge within the rule, "Evidence of recent, unexplained, exclusive possession by an accused of stolen property may, of itself, raise an inference of his guilt sufficient to war-

487

rant his conviction of burglary and larceny, in the absence of other facts and circumstances in evidence which leave in the mind of the jury a reasonable doubt as to guilt." People v. Nixon, 414 Ill 125, 129, 111 NE2d 116 (1953).

We conclude that this trial reflects less than is to be desired of both the prosecution and the defense. The other prejudicial errors of which defendant complains are not discussed because they will undoubtedly not re-occur in a new trial.

For the reasons given, defendant's convictions of the offenses of murder and of theft are reversed and the cause is remanded for a new trial on both charges.

Reversed and remanded.

KLUCZYNSKI, P. J. and BURMAN, J., concur.