THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JESUS OLMOS *et al.*, Defendants-Appellants.

First District (2nd Division)   Nos. 77-41, 77-233 cons.

Opinion filed December 12, 1978.

James J. Doherty, Public Defender, of Chicago (Peter J. Hickey, III, John Ryan, and Vincent M. Gaughan, Assistant Public Defenders, of counsel), for appellant Jesus Olmos.

James A. Stamos, of Chicago, for appellants Eloy Cordova and Gustavo Cordova.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Renee G. Goldfarb, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DOWNING delivered the opinion of the court:

The defendants, Eloy Cordova[1] (Eloy), Gustavo Cordova (Gustavo), and Jesus Olmos (Olmos), were indicted for armed robbery, attempt murder, aggravated battery causing great bodily harm, and aggravated battery with a deadly weapon. Following a jury trial in the circuit court of Cook County, defendant Eloy was found guilty of armed robbery and was sentenced to four years to four years and a day imprisonment. Defendant Gustavo was found guilty of armed robbery and aggravated battery causing great bodily harm, and was sentenced to four years to four years and a day for armed robbery, and one to three years for aggravated battery causing great bodily harm, both sentences to run concurrently. Defendant Olmos was found guilty of armed robbery and aggravated battery causing great bodily harm. Judgment was entered only on the armed robbery charge, and Olmos was sentenced to four years to four years and a day imprisonment.

On appeals consolidated for review[2] defendants contend the following: (1) they were not proved guilty of the crimes beyond a reasonable doubt; (2) they were denied their Sixth Amendment right to confrontation; (3) prosecutorial misconduct denied them due process of law and a fair trial; (4) the trial court erred in not permitting the defendant Eloy to testify to intention, motive, or belief; (5) the trial court

---

[1] When testifying, Eloy spelled his last name as Cardova. However, we adopt the spelling Cordova in our opinion as it was captioned in the record on appeal.

[2] Defendant Olmos' appeal in our case no. 77-41 was consolidated with defendants Gustavo and Eloy's appeal in our case no. 77-233.

erred in not permitting defendants to perfect impeachment of the victim; (6) the trial court erred in permitting identification testimony by the victim admitted as evidence; (7) the trial court erred in permitting identification testimony by the arresting officer admitted as evidence; and (8) they were denied their Sixth Amendment right to trial before an impartial jury. In addition, defendants Eloy and Gustavo contend the following: (9) the trial court erred when it failed to *voir dire* the jury after learning of an unauthorized communication by defendant Eloy; and (10) the trial court erred when it failed to *sua sponte* submit a definitional instruction to the jury.

The alleged armed robbery occurred in the early morning hours of October 1, 1974. The victim testified that he worked as a stable hand and lived in Morton Grove, Illinois. On September 30, 1974, he received a paycheck in the amount of $213 which he cashed for a fee of about $1. He then bought $27 worth of groceries. Later that evening, he and his cousin took a cab to a bar in Morton Grove where they had two beers. At about 12:30 a.m. they left and took a cab to the Bohemia Tavern at 1337 West 18th Street in Chicago. After ordering a drink, the victim went to the washroom. Defendant Olmos tried to take his wallet from his back pocket as he walked by the bar, at which time he told Olmos to keep away from him, proceeded to the washroom, and then returned to his table.

Shortly thereafter, the three defendants and another man approached the victim's table and Gustavo attempted to strike him. In order to protect himself, the victim stated he pushed Gustavo and then left the tavern with his cousin, crossed 18th Street, and walked eastward. The victim stated that while walking, someone grabbed the back of his jacket. Upon turning, he saw Gustavo and also saw three other men standing there, two of the men he identified in court as defendants Olmos and Eloy. The victim's cousin went to a nearby restaurant. Gustavo then knocked the victim to the ground while Olmos whipped him several times with a long chain. While the victim was on the ground, Olmos took his wallet and walked away with the other two defendants.

On cross-examination, the victim admitted stating at the preliminary hearing that it was Gustavo who whipped him with the chain and explained that he was confused by the question when asked at the preliminary hearing.

The victim testified that he followed the men demanding the return of his wallet. According to the victim, Eloy turned around and fired a gun at him. On cross-examination it was brought out that the victim did not know if Eloy shot directly at him or not. After the shot was fired, he went to the restaurant where his cousin had gone to call the police. Before doing so he saw a police car, ran to it, pointed to defendants, and said,

"those guys robbed me * * * be careful because one of them has a gun on him * * * they took $200 out of my wallet."

The victim got into the squad car and drove with the officers to defendants. When the officers placed defendants under arrest, the victim jumped out of the police car and struck Olmos.

At the police station the victim stated he had two marks on his back that were not "real bad," a mark on the left side of his eye, and his back pants pocket was ripped.

Officer Kent of the Chicago Police Department testified for the State, that on October 1, 1974, at approximately 2 a.m., he and his partner received a call over the police radio that men were fighting at 1324 West 18th Street. En route he observed four men about one-half block from that address. He identified three of the four men as the defendants. He then proceeded to the address and stopped across the street from the Bohemia Tavern. The victim ran up to the car and pointed to the men Kent had observed and said, "Those guys, they robbed me. Be careful. One of them got a gun." Kent noticed the victim was bleeding from his left eye. The officer testified that he pursued the defendants with the victim and shouted at them to halt. Three of the four men stopped, but Eloy continued walking at a fast pace. Kent observed Eloy reach into his pocket, pull out a gun, and throw it over a fence into a vacant lot. Eloy then turned around and stopped.

At the police station, Kent stated that he recovered $200 from Eloy's shirt pocket, seven $20 bills and six $10 bills, and $7 from his wallet. He also recovered a chain belt from Olmos which he had wrapped around his waist. Kent stated that he observed several welts, 12″ to 18″ in length, on the victim's back.

About 45 minutes after the incident, Kent went back to the scene and retrieved the gun Eloy had thrown over the fence, and found a round in the chamber ready to be fired and a spent cartridge casing north of the closest alley to 1324 West 18th Street. No ballistic tests were performed on this casing. Kent's testimony as to the places where he recovered these items did not correspond with the places noted on the inventory slip he had prepared. The officer stated that the address on the inventory slip was incorrect. Kent also testified that he ran a registration check on the gun and found it was not registered.

Defendant Eloy testified in his own behalf. He stated that he owned the Bohemia Tavern, as well as a body shop, a parking lot, and two buildings; that he had been a special officer of the Mexican police and a lieutenant of the special police of commercial bankers; that he worked for the State of Illinois in narcotics investigation; and that for the past five years and presently he was working for the Federal narcotics department.

Eloy testified that on September 30, 1974, a tenant paid him $100 in ten- and twenty-dollar bills for rent, and that he put this money in his shirt pocket. The tenant, called as a defense witness, confirmed this fact. Eloy stated that later that night he went to the Bohemia Tavern where he met his brother Gustavo, and defendant Olmos. Eloy testified that the victim entered the bar at about 12:30 a.m.; that the victim approached Olmos and started caressing his hair; and that Olmos said something and then the victim walked toward the band requesting some songs. Later he observed an argument between the victim and the band.

Eloy stated that Gustavo and Olmos left the tavern a few minutes after the victim. Soon afterward Eloy was informed that there was a fight outside. Eloy observed altercations between Gustavo, the victim, Olmos, and the victim's cousin. Eloy heard the victim say something (the substance of which he was not allowed to testify to at trial), and Eloy fired his gun into the air. He demonstrated to the jury how he fired the gun down toward the ground. He stated that he did not fire the gun at the victim, nor did he intend to kill anyone, that he carried a gun because he had been threatened in his work with the Federal Government, and he also carried large amounts of money.

After the shot, the fighting stopped and Eloy, Gustavo, and Olmos proceeded to the corner of 18th Street and Blue Island. When the police arrived about 10 minutes later, they yelled at him to stop. Eloy stated that he threw his gun over a fence and stopped. He testified that at the time he was arrested he had $100 in his shirt pocket, about $70 in his wallet, and about $38 in his front pants pocket. He stated that he never saw anyone take the victim's wallet.

Defendant Olmos testified that he and Gustavo went to the Bohemia Tavern, and while sitting at the bar, the victim came up behind him, pulled his hair, and asked him how much he charged to go to bed. Olmos stood up and asked the victim if he knew the difference between a man and a woman, to which the victim made some remark and walked away. Olmos testified that he did not see the victim go to the washroom and never attempted to take his wallet.

Olmos and Gustavo left the tavern a few minutes after the victim and saw him standing outside with several others. The victim approached Olmos and held a beer bottle to Olmos' face. On cross-examination, Olmos stated that the victim broke the bottle at his feet. Olmos testified that Gustavo stepped in to prevent the fight, but that the victim pushed Gustavo and started fighting with him while the cousin started fighting with Olmos. Olmos stated that the victim had a knife and Gustavo took off his leather belt and hit the victim with it in order to defend himself. A shot was fired and the victim and his cousin stopped fighting and went

into the restaurant across the street. Olmos then walked away with Gustavo and Eloy. Olmos denied hitting the victim with his chain belt and denied taking his wallet.

Jesus Padilla, one of the band members at the Bohemia Tavern, testified that the victim had requested they play some songs for him, but he did not pay because he said he had no money.

Defense witness, James Scott, a statistician for the City of Chicago assigned to the gun registration unit, testified that the gun Officer Kent recovered from the scene was registered with the City of Chicago by defendant Eloy 10 months prior to the date of the incident.

Defendant Gustavo did not testify.

## I.

Defendants initially contend they were not proved guilty of the crimes beyond a reasonable doubt.

## A.

Defendants maintain that the testimony of the victim when viewed in its entirety is replete with inconsistencies and is so improbable as to raise a reasonable doubt of defendants' guilt, citing *People v. Coulson* (1958), 13 Ill. 2d 290, 297, 149 N.E.2d 96. The court in *Coulson* stated that where the testimony is contrary to the laws of nature or universal human experience, it is not bound to believe the witness. Defendants point out several reasons why the victim's story should not be believed, placing emphasis on its contention that the victim by his own testimony could not have been robbed of $200.

The evidence indicated that the victim received a paycheck in the amount of $213 which he cashed at a currency exchange for about $1. He spent $27 for groceries, took several cab rides, and drank beer in two different taverns. However, defendant testified that his cousin paid the cab fares and paid for his drinks. Defendant also testified to being robbed of six $10 bills and seven $20 bills. This testimony was corroborated by Officer Kent who testified to recovering those exact denominations of money from Eloy's shirt pocket. There was no evidence presented to indicate how the victim would have known Eloy was carrying that amount of money in those exact denominations. Although Eloy offered an explanation as to why he had that amount of money, the jury chose not to believe him.

Defendants contend that it is incredible to believe they would commit an armed robbery in their own community in the middle of a main thoroughfare in front of a restaurant. Defendants also point out that they did not leave the vicinity when they first saw the police car, nor did Eloy attempt to dispose of the incriminating evidence, the $200.

It is not unreasonable to assume that one would commit a crime in his

own neighborhood. (*People v. Hampton* (1st Dist. 1968), 103 Ill. App. 2d 57, 66, 243 N.E.2d 371.) The record indicates that the incident took place at about 2 a.m., and the victim testified that Eloy was standing "on the side of the wall" when he fired the gun. Officer Kent testified that Eloy did not heed his first order to halt but kept walking quickly, and although not disposing of the $200, he did throw his gun over a fence before surrendering to the police.

■■ Defendants refer to other inconsistencies reflecting on the credibility of both the victim and Officer Kent. It is the function of the jury to weigh the evidence, judge the credibility of the witnesses, and determine factual matters in a conflicting set of circumstances. (*People v. Dillon* (1st Dist. 1975), 28 Ill. App. 3d 11, 19, 327 N.E.2d 225; *People v. Wade* (5th Dist. 1977), 51 Ill. App. 3d 721, 726, 366 N.E.2d 528.) Where the evidence on an issue is conflicting but legally sufficient if the prosecution's witnesses are believed, the question is for the trier of fact. (*People v. Carpenter* (1963), 28 Ill. 2d 116, 122, 190 N.E.2d 738.) The testimony of a single witness, even if it be that of a crime victim and even if it is contradicted by the accused, is sufficient to convict if that testimony is positive and credible. (*People v. Daily* (1968), 41 Ill. 2d 116, 120, 242 N.E.2d 170.) Only where the evidence is so improbable as to raise a reasonable doubt of guilt will a reviewing court disturb the jury's determination of guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313.) In our opinion there is sufficient credible evidence to sustain the convictions.

### B.

Defendants Olmos and Gustavo contend there was no evidence presented indicating the victim suffered great bodily harm and therefore their convictions of aggravated battery were not proved beyond a reasonable doubt.

Defendants rely on the victim's testimony that the marks on his back were not "real bad," lack of evidence at trial as to bleeding near the victim's eye, and the victim's failure to seek medical attention. Defendants argue that great bodily harm connotes an injury of a much more grievous and serious character than that implied by ordinary battery.

■■ This court has said that the term "great bodily harm" is not susceptible to precise legal definition. What constitutes great bodily harm is a question of fact for the jury's determination. (*People v. Smith* (1st Dist. 1972), 6 Ill. App. 3d 259, 264, 285 N.E.2d 460.) The question is not what the victim did or did not do to treat the injury inflicted, but what injuries he did in fact receive. (*People v. Carmack* (3d Dist. 1977), 50 Ill. App. 3d 983, 985, 366 N.E.2d 103.) The victim testified that he was whipped with a long chain belt on his back. He demonstrated to the jury the manner in which this was done, and the jury had an opportunity to

view the chain belt. Contrary to defendants' contention, Officer Kent testified that he noticed the victim was bleeding from his left eye when he ran up to the car. Kent also testified to observing three or four welts on the victim's back 12″ to 18″ in length. Based upon this evidence, the jury's finding of great bodily harm is not so improbable or unjustified as to warrant reversal.

## C.

Defendants contend that as a matter of law they were not proved guilty of armed robbery. A person commits armed robbery when he takes property from the person or presence of another by the use of force or by threatening the imminent use of force while armed with a dangerous weapon. Ill. Rev. Stat. 1975, ch. 38, pars. 18—1(a), 18—2(a).

■ Defendants argue that their acquittal of aggravated battery with a deadly weapon was tantamount to the jury finding that the chain was not a deadly weapon. The armed robbery statute specifically states "dangerous" not "deadly" weapon. The jury's acquittal of defendants on the charge of aggravated battery with a deadly weapon has no effect on the conviction for armed robbery. (*People v. Dawson* (1975), 60 Ill. 2d 278, 280-81, 326 N.E.2d 755.) The nature of the weapon and its potential for doing harm were questions of fact for the jury to decide. (*People v. Robinson* (1978), 73 Ill. 2d 192, 202, 383 N.E.2d 164.) Of course, the record indicates evidence of both a chain belt and a gun.

Defendants proceed on the supposition that the jury found the gun to be the dangerous weapon and argue that the acts which constituted the alleged robbery had been completed before Eloy fired the gun and before the victim knew Eloy had a gun. Defendant Eloy further maintains that he fired the gun to break up the altercation, an act independently motivated and unaccompanied by the required mental state for armed robbery, citing *People v. Simmons* (2d Dist. 1975), 34 Ill. App. 3d 970, 342 N.E.2d 322.

In *Simmons*, the court found that defendant did not use his gun to obtain the stolen property but used it solely in connection with a subsequent aggravated battery. Unlike *Simmons*, the victim here testified that when he tried to retrieve his wallet immediately after it was taken from him, Eloy turned around and fired the gun, thus preventing his recovery. The use of a dangerous weapon at any point of a robbery, so long as it can reasonably be said to be part of a single occurrence or incident, will constitute armed robbery. *People v. Heller* (3d Dist. 1971), 131 Ill. App. 2d 799, 803, 267 N.E.2d 685.

Defendant Eloy further argues that he did not arrive at the scene until after the alleged robbery had been committed and cannot be held accountable for the actions of his co-defendants.

The jury heard the victim testify that when Gustavo grabbed the back of his jacket (an act preceding the robbery), the victim turned around and saw three other men with Gustavo. The victim pointed out two of those men as being present in the courtroom, one was the defendant Eloy. The victim also testified that while he and Gustavo were fighting, Eloy was standing nearby, and after the fight Eloy walked away with the other two defendants. The money the victim alleged was stolen was recovered from Eloy's shirt pocket. As was said in *People v. Washington* (1962), 26 Ill. 2d 207, 209, 186 N.E.2d 259:

> "[I]f the proof shows that a person was present at the commission of the crime without disapproving or opposing it, it is competent for the trier of fact to consider this conduct in connection with other circumstances and thereby reach a conclusion that such person assented to the commission of the crime, lent to it his countenance and approval and was thereby aiding and abetting the crime. [Citations.]" See *People v. Morgan* (1977), 67 Ill. 2d 1, 364 N.E.2d 56.

The jury is not compelled to accept the defendant's version of the story but may consider the surrounding circumstances and the probability or improbability of the defendant's account. If the circumstances show a common design to do an unlawful act to which all assent, the act of one is the act of all. (*People v. Heflin* (1978), 71 Ill. 2d 525, 533-34, 376 N.E.2d 1367.) Based on the record before us we cannot say that the evidence presented was so unsatisfactory as to create a reasonable doubt of guilt.

## II.

Defendants urge that the trial court denied them their Sixth Amendment right of confrontation in limiting their cross-examination of the two State's witnesses.

Defendants claim they were denied the opportunity to present their theory of defense to the jury. Their theory was that the victim was an illegal alien who had been engaged in a simple altercation with defendants; when he saw the police officers approaching, he made up a story that his wallet was stolen in order to prevent the police from asking him for identification and discovering he had not registered as an alien and was in this country illegally. This, defendants argue, revealed the victim's motive to testify falsely.

The trial court prohibited the defense from questioning the victim as to whether he was in the country illegally. However, the court allowed the defense to cross-examine the victim and elicited the following testimony: the victim was a citizen of Mexico, he last entered the United States from Mexico in 1974, and did not register with the United States immigration

authorities at that time; that he has never registered with the immigration authorities; that he did not report his address to the United States Post Office in January of each year; that he is not a United States citizen; that he does not have an immigration green card; that when he entered the United States he did not advise the authorities he was not a citizen; and that he never had an immigration or naturalization card in the name of Eulalio Sanchez, or Eulalio Sanchez Aguilar, or Eulalio Gonzales.

The widest latitude is generally allowed the defendant in cross-examination for the purpose of establishing the witness' bias, prejudice, or motive to testify falsely. (*People v. Mason* (1963), 28 Ill. 2d 396, 403, 192 N.E.2d 835; *People v. Barr* (1972), 51 Ill. 2d 50, 51-52, 280 N.E.2d 708.) However, courts have refused to extend this rule to include situations where the witness had simply been under investigation for a particular crime. (*People v. George* (1971), 49 Ill. 2d 372, 380-81, 274 N.E.2d 26; see also *People v. Pickett* (1st Dist. 1975), 34 Ill. App. 3d 590, 597-98, 340 N.E.2d 259.) Furthermore, the latitude to be allowed in cross-examination of witnesses rests largely in the discretion of the trial court, and it is only in a case of clear abuse of such discretion, resulting in manifest prejudice to the defendant, that a reviewing court will interfere. *People v. Halteman* (1956), 10 Ill. 2d 74, 86, 139 N.E.2d 286.

Defendants rely on *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105, *People v. Norwood* (1973), 54 Ill. 2d 253, 296 N.E.2d 852, and *People v. Barr* as examples where the trial court's limitation of cross-examination was held to be an abuse of discretion and prejudicial error.

All three of these cases present fact situations where the witness had been arrested or charged with a crime. In the present case, the defense sought to question the victim about something for which no charge, indictment, arrest, or investigation had been made.

In our opinion, the testimony brought out in the cross-examination of the victim clearly established the theory defendants suggest was excluded.

■■■ Based upon the record in the present case, we find that the defense was afforded ample opportunity to argue their theory of defense to the jury if they elected to do so. However, the defense waived their closing argument to the jury, and in so doing also waived the argument they now make on appeal. We find defendants' argument to be without merit and the cases they cite inapplicable.

An objection was sustained to defense counsel's question of the victim regarding where he stayed in Mexico when he was there in 1974 for five months. Defendants argue that a witness' address is basic to cross-examination, citing *Smith v. Illinois* (1968), 390 U.S. 129, 19 L. Ed. 2d 956, 88 S. Ct. 748, and *Alford v. United States* (1931), 282 U.S. 687, 75 L. Ed.

624, 51 S. Ct. 218. Neither of these cases dealt with the question concerning one's prior address.

■■ Testimony was elicited from both the victim and Officer Kent on cross-examination which informed the jury that neither spoke with defense counsel even though requested. An objection was sustained to the question of whether they refused to speak to defense counsel. The trial court also precluded the defense from establishing that Officer Kent was operating under a quota system whereby his efficiency rating was determined by the number of arrests he made. We fail to see how the trial court abused its discretion to the prejudice of the defendants in refusing any of the aforesaid lines of questioning. See *People v. Peter* (1973), 55 Ill. 2d 443, 451-52, 303 N.E.2d 398.

## III.

Defendants allege prosecutorial misconduct denied them a fair trial and due process of law. At trial, Officer Kent testified that a registration check on the gun he recovered from Eloy was made in order to determine ownership. He testified that the check indicated the gun was not registered and he included this in his police report.

The defense had procured a document which indicated that the gun was registered to Eloy 10 months prior to the incident. The defense had this document for three days before Kent testified but did not tender it to the State. Upon cross-examination the defense showed Kent the gun registration document, and Kent admitted that the document indicated the gun had been registered. The defense also called its own witness, Scott, who testified to the registration of the gun.

■■ Defendants maintain that the State, by asking Officer Kent whether the gun was registered and receiving a negative response, purposely injected into the record evidence of a crime with which Eloy had not been charged. The record indicates the defense made no objection nor specifically raised this issue in its motion for a new trial. Therefore this issue is waived on review. (*People v. Osborn* (1st Dist. 1977), 53 Ill. App. 3d 312, 319, 368 N.E.2d 608; *People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856.) We note that when asked by the trial court why they did not object, the defense replied that they could not anticipate the witness' response, and if he said the gun was registered, it would be "favorable" to them. It is apparent that the defense intentionally allowed the question to be asked as part of their trial strategy.

Defendants also contend as improper the question asked by the State of defense witness, Scott, as to whether the gun registration certificate was a license to carry a gun on the street and fire it at anybody. Objection to this question was sustained and the jury was instructed to disregard it. Defendants' motion for mistrial was denied.

■■ In view of the fact that Officer Kent's testimony regarding the registration of the gun was discredited through his own cross-examination, the rebuttal testimony of Scott, and the prompt instruction to the jury on the matter, we fail to find any reasonable prejudice to the defendants. Compare *People v. Weaver* (1972), 7 Ill. App. 3d 1104, 1106-07, 288 N.E.2d 669.

## IV.

Defendants contend that the trial court erred in not permitting defendant Eloy to testify to intention, motive, or belief. Eloy was not allowed to testify that he heard the victim say, "Get a gun" just before Eloy fired his gun. Defendants contend Eloy fired the gun in self-defense and this testimony was relevant to show Eloy's state of mind.

■■ Where the intention or motive of the accused is in issue, he has a right to testify as to his intentions or motives and to have the circumstances surrounding the act considered in connection with his testimony. (*People v. Perry* (1st Dist. 1974), 19 Ill. App. 3d 254, 259, 311 N.E.2d 341.) While we find it was error not to admit such testimony, in view of the other evidence presented, we do not find it to be so prejudicial as to cause reversible error.

## V.

Next, defendants maintain that the trial court erred in not permitting them to perfect impeachment of the victim.

During cross-examination the victim testified that he requested the band at the Bohemia Tavern to play songs for him but denied telling one of the players that he had no money since they never asked him for money. The defense then sought to impeach the victim by asking defendant Eloy if he heard such a statement. The State objected on the ground that the music player had already testified as a defense witness which established the impeachment. The trial court sustained the objection.

■■ ■ Evidence of a prior inconsistent statement by a witness is not admissible as proof of the truth of the statement but is admissible to impeach that witness' credibility. (*People v. Moses* (1957), 11 Ill. 2d 84, 87, 142 N.E.2d 1.) To guard against the danger of having the jury regard the statement as substantive evidence rather than merely as a statement bearing on the witness' credibility, the impeachment should not be repetitious. (*People v. Collins* (1971), 49 Ill. 2d 179, 195, 274 N.E.2d 77.) Prohibiting the impeachment was not reversible error here where the record indicated that the band member to whom the statement was made testified on behalf of the defense that the victim told him he did not have any money to pay for the songs he requested.

# VI.

Defendants contend that the victim's testimony as to what he told the police officers when they arrived at the scene was inadmissible hearsay and improperly used to bolster the victim's in-court identification of defendants.

At trial, over defendant's objection, the victim's statements were admitted under the spontaneous utterance exception to the hearsay rule. Defendants argue that since the victim had sufficient time in which to reflect upon the incident before his conversation with the officers, it was not of the spontaneous nature required under the exception, and therefore the admission of this testimony constituted reversible error.

The main rationale underlying the exclusion of hearsay evidence is found in the opposing party's inability to subject the source of the assertion to cross-examination. (*People v. Robinson* (1978), 73 Ill. 2d 192, 200, 383 N.E.2d 164.) Without such an opportunity for cross-examination, the trustworthiness of the statements cannot be tested. If the person who made the out-of-court assertion is present and testifies under oath to his prior statements, and is subject to cross-examination, then the fundamental purpose of the hearsay rule is satisfied. *People v. Carpenter* (1963), 28 Ill. 2d 116, 121, 190 N.E.2d 738.

■■ Here, the victim testified in court to out-of-court statements he, himself, made and was subject to cross-examination. Thus his statements were not impaired by hearsay objections.

■■ However, this is not to say that the victim's statements were admissible evidence. The testimony of a witness cannot be bolstered up or supported by showing that the witness has made similar statements out of court in harmony with his testimony on the witness stand. (*People v. Clark* (1972), 52 Ill. 2d 374, 389, 288 N.E.2d 363.) There are three exceptions to this rule: a spontaneous utterance, corroboration of a prompt complaint in a rape case, and a rebuttal to a charge of recent fabrication. *People v. Buckley* (2d Dist. 1976), 43 Ill. App. 3d 53, 55, 356 N.E.2d 1113.

Whether the victim's statements fell within one of the exceptions is irrelevant since we do not believe the admission of those statements was so prejudicial as to require a new trial. The admission of improper evidence at trial does not amount to reversible error when the same matter had been proved by competent evidence. *People v. Torres* (1st Dist. 1974), 18 Ill. App. 3d 921, 929, 310 N.E.2d 780.

■■ In the present case, the victim positively identified defendants in court as the men who robbed him, and his testimony was corroborated by physical evidence recovered by the police. Therefore, we find that the victim's statements, if erroneously admitted, were at most harmless error. See *People v. Canale* (1972), 52 Ill. 2d 107, 114-15, 285 N.E.2d 133.

## VII.

Defendants also contend that it was error to permit Officer Kent to testify to the statements made by the victim not upon hearsay grounds but because it was improperly used to bolster the victim's testimony.

Defendants rely on *People v. Lukoszus* (1909), 242 Ill. 101, 89 N.E. 749, and *People v. Wright* (1st Dist. 1965), 65 Ill. App. 2d 23, 212 N.E.2d 126, where it was held to be reversible error to permit a police officer to repeat the victims' statements implicating the defendants. In both those cases, unlike the present case, the sole evidence involving defendant in the crime was the testimony of the victim, and the testimony of the police officers was offered to bolster otherwise uncorroborated testimony.

As noted above, the victim not only positively identified the defendants, but other corroborating evidence was also presented. Officer's testimony was merely cumulative and not prejudicial. *People v. Weaver* (1972), 7 Ill. App. 3d 1104, 1106, 288 N.E.2d 669.

## VIII.

Defendants contend that they were denied their right to trial before an impartial jury. Shortly after the jurors retired to deliberate, they informed the trial court through the bailiff that guilty verdict forms for the charge of armed robbery were missing. The trial court requested the verdict forms be brought back and verified this as true. The court then submitted the missing forms. The trial court explained that during this time it made an unsuccessful attempt to reach defense attorneys by telephone.

Defendants do not question the trial court's explanation as to what happened, but allege that since this occurred in the absence of defendants and their attorneys, it has the appearance of impropriety which caused reversals in *Parker v. Gladden* (1966), 385 U.S. 363, 17 L. Ed. 2d 420, 87 S. Ct. 468, and *People v. Harmon* (1st Dist. 1968), 104 Ill. App. 2d 294, 244 N.E.2d 358.

In *Parker*, a bailiff stated to one of the jurors while in the presence of other jurors, "Oh that wicked fellow [petitioner], he is guilty," and on another occasion said to another juror, "If there is anything wrong [in finding petitioner guilty] the Supreme Court will correct it." The supreme court found the bailiff's conduct involved such a probability that prejudice would result that it was deemed inherently lacking in due process.

In *Harmon*, the court failed to clarify an improper instruction when so requested by the jury, and the trial judge made no attempt to contact defendant or his attorney.

A jury verdict will not be set aside where it is apparent that no injury or prejudice resulted from a communication to the jury either by the court

or by third persons outside the presence of the defendant. (*People v. Rettig* (1972), 50 Ill. 2d 317, 319, 278 N.E.2d 781.) In *Rettig*, quoting from *People v. Mills* (1968), 40 Ill. 2d 4, 237 N.E.2d 697, the court stated:

"'* * * The recent Supreme Court decision of *Parker v. Gladden* [citation], does not in any way diminish the need for showing that the rights of a defendant were prejudiced by the acts * * *'." 50 Ill. 2d 317, 319.

In *People v. Brothers* (1932), 347 Ill. 530, 545-49, 180 N.E. 442, the jury was inadvertently given a manslaughter verdict form when it was not an issue. The court found no prejudice resulted when the trial judge withdrew the form in the absence of the defendant.

■■ In the present case no prejudice was shown. We find the court's action to be merely procedural in nature and not in error.

## IX.

Defendants allege error in the failure of the trial court to conduct a voir dire of the jury after learning of an unauthorized communication to the jury by defendant Eloy.

The record indicates that after both sides rested but before closing arguments, the deputy sheriff informed the court that defendant Eloy had asked two jurors to have a drink with him which they refused. Counsel for the defendants requested a voir dire of the two jurors to determine if they could still give the defendants a fair and impartial trial. The court stated that "it would possibly ask the two." Other things were then discussed, and the defense asked the court to proceed. The State made its closing argument, after which the defendants made a motion for a directed verdict. This motion was denied. The court instructed the jury and the alternate jurors were excused. The motion to voir dire the jurors was not renewed, and no objection to the dismissal of the alternate jurors was made.

Defendants contend it was error not to conduct the voir dire, and in any event defendants, Olmos and Gustavo, should not be penalized for the actions of Eloy.

Defendants have again failed to point out how they were prejudiced by this action. The communication was not made outside the presence of defendant Eloy since he, himself, made it. Defendant Olmos did not raise this issue on appeal. And defendant Gustavo has not shown how his co-defendant's conduct might have prejudiced him.

## X.

Finally, defendants Gustavo and Eloy contend that it was reversible error for the court not to *sua sponte* instruct the jury as to the definition of reasonable belief as used in the instruction to the jury on self-defense.

In defense to the charge of aggravated battery causing great bodily harm, defendants Gustavo and Eloy claimed they were acting in self-defense. Illinois Pattern Instructions, Criminal, No. 24.06 (1968) (hereinafter IPI), on self-defense was submitted to the jury and read:

"A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.

However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself." IPI Criminal No. 24.06 (1968).

Defendants contend that in order for the jury to be properly instructed on this issue, the instruction defining reasonable belief should have been submitted.

IPI Criminal No. 4.13 (1968) reads:

"When I use either of the phrases 'reasonable belief' or 'reasonably believes' I mean that the person concerned, acting as a reasonable man, believes that the described facts exist."

There is no indication in the record that defendants tendered this instruction to the court. And defendants admit their failure to raise this issue prior to appeal.

The burden of preparing jury instructions is primarily on the parties, and the trial court has no obligation to submit jury instructions not requested by counsel. (*People v. Underwood* (1978), 72 Ill. 2d 124, 129, 378 N.E.2d 513; *People v. Parks* (1976), 65 Ill. 2d 132, 137, 357 N.E.2d 487.) Unless a party tenders an instruction, he waives his right to appeal the failure to give an instruction. (Ill. Rev. Stat. 1977, ch. 110A, par. 366(b)(2)(i).) An exception to this waiver rule can be applied in situations where the interests of justice require review of substantial defects in jury instructions. Ill. Rev. Stat. 1977, ch. 110A, par. 451(c).

■■ However, the recent decision of the Illinois Supreme Court in *People v. Underwood* controls where it was held that the omission of the definitional instruction on reasonable belief was not so basic to the given instruction on self-defense as to constitute a substantial defect and did not result in an unfair trial.

### XI.

The jury found defendant Olmos guilty of armed robbery and aggravated battery causing great bodily harm. Without further explanation, the trial judge stated that judgment would be entered only on the armed robbery conviction and imposed sentence accordingly.

The State contends that judgment on the aggravated battery offense

should have been entered, and the case should now be remanded to the trial court for sentencing on that offense. Defendant Olmos appealed both his convictions but did not reply to the State's contention concerning this issue.

■■ Final judgment in a criminal case is the sentence. (*People v. Warship* (1974), 59 Ill. 2d 125, 130, 319 N.E.2d 507; *People v. Blakeney* (1st Dist. 1978), 59 Ill. App. 3d 119, 124, 375 N.E.2d 1309.) An appeal cannot be entertained in absence of the imposition of sentence. (*People v. Lilly* (1974), 56 Ill. 2d 493, 496, 309 N.E.2d 1.) Despite the fact that no sentence was imposed on defendant's aggravated battery conviction, this case is properly before this court on defendant's appeal from his conviction for armed robbery. *People v. Lilly; People v. Griffin* (5th Dist. 1977), 56 Ill. App. 3d 255, 257, 371 N.E.2d 1160.

■■ ■ We assume the trial judge did not impose sentence on the aggravated battery charge since it arose out of the same course of action involved in the armed robbery. However, when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser-included offenses, multiple convictions with concurrent sentences may be entered. (*People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838.) Aggravated battery causing great bodily harm is not a lesser-included offense of armed robbery since proof of great bodily harm is not necessary to establish armed robbery. Robbery is an offense directed against property while aggravated battery is an offense directed against the person, each requiring different elements of proof.

Accordingly and under the authority granted us by Supreme Court Rule 366(a)(5) (Ill. Rev. Stat. 1977, ch. 110A, par. 366(a)(5)), we remand this case to the trial court for imposition of sentence on the conviction of defendant Olmos for aggravated battery causing great bodily harm. See *People v. Scott* (1977), 69 Ill. 2d 85, 88, 370 N.E.2d 540.

For these reasons, the judgment of the trial court is affirmed. The cause is remanded to the trial court for sentencing on the conviction of Jesus Olmos for aggravated battery causing great bodily harm.

Affirmed and remanded.

PERLIN and BROWN[3], JJ., concur.

---

[3] Justice Brown participated in this decision while assigned to the Illinois Appellate Court, First District.